Bonjean Law Group, PLLC
1000 Dean St., Ste. 422
Brooklyn, New York  11238
Tel: (718) 875-1850
Fax: (718) 230-0582
Jennifer@bonjeanlaw.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

**ANTHONY MOORE,**

        Plaintiff,

                                   2014-CV-05092 (JBS) (JS)

-v-

**CITY OF ATLANTIC CITY, ET AL.,**

        Defendants.

### PLAINTIFF'S RESPONSE TO DEFENDANT SYDNOR'S MOTIONS *IN LIMINE*

The bulk of defendant Sydnor's motion *in limine* complains that Plaintiff has identified numerous witnesses on the Final Pre-Trial Order ("FPTO") who have no first-hand knowledge about the incident that occurred at Bally's Casino on October 7, 2012. Defendant Sydnor seems to take the position that only witnesses who were present when defendant Sydnor beat Plaintiff in the head with his baton may give relevant testimony at this trial.

First, defendant Sydnor simply ignores that Plaintiff has alleged that the City of Atlantic City is directly liable for defendant Sydnor's constitutional violation of Plaintiff's right to be free of excessive force because of its *de facto* policies and practices. As such, Plaintiff is obligated to prove by a preponderance of the evidence that such practices and customs existed, that they amounted to a standard operating procedure as opposed to intermittent or isolated occurrences, and that they *proximately* caused the constitutional violation committed by defendant Sydnor. To

meet his burden of proof, Plaintiff must be permitted to present such evidence in support of his *Monell* theories. To the extent such evidence has the potential to cause any prejudice to defendant Sydnor, this Court can surely remedy that potential prejudice through limiting instructions.

Second, as described more fully below, Plaintiff does seek to introduce select testimony and evidence related to specific internal affairs complaints against Sydnor either because it is admissible pursuant to Fed. R. Civ. P. 404(b) or is relevant to *Monell* liability.

## RELEVANT FACTS

On October 7, 2012, Plaintiff, along with his brother Ciaran Moore, and a group of friends gathered at Bally's Casino in Atlantic City to celebrate Ciaran's bachelor party. The group spent the better part of the evening drinking alcohol at Bally's Mountain Bar. At some point, Plaintiff, who was seated at a table with some friends, noticed that his brother was being escorted from the bar by a group of security personnel and uniformed Atlantic City police officers, including defendant Sydnor. Casino video surveillance captured these events.

Plaintiff observed defendant Sydnor grabbing and pushing his brother and another friend as they walked toward the exit and ran over to the commotion to intervene. Plaintiff is observed on video confronting Sydnor who can be observed physically pushing Plaintiff. As the group moved toward the exit, Sydnor repeatedly escalated tensions with Plaintiff who was clearly intoxicated and becoming increasingly agitated by Sydnor's unnecessary and aggressive behavior. Despite this volatile situation, neither defendant Sydnor nor his supervisor Sergeant Brubaker made any efforts to arrest this unruly group, claiming that Bally's did not want to press charges. Instead, defendant Sydnor continued to bait and taunt a group of over-served patrons.

Sergeant Brubaker testified at this deposition to the following:

Q.     Why didn't you just make a decision at that point to de-escalate the situation by arresting the belligerent dude?

A.     We made the determination along with Bally's that they wanted him escorted from the property, that's what we're paid by security to be there for. We're paid by Bally's, that what they wanted us to do. They asked us to escort the people off the property. (Brubaker Dep. 89:19-90:4)

As the group made its way into a vestibule before exiting to the outside, Sydnor and Plaintiff continued to exchange words. At one point in the video, Ciarin can be observed stepping in-between Plaintiff and Sydnor, and Sydnor can be observed either falling to the ground or being pushed to the floor by Ciaran. Ciaran Moore is immediately brought to the ground by officers, and an incensed and out of control defendant Sydnor pushes a female to the side, busting his way into the vestibule in search of Plaintiff who had retreated to the area and was standing passively in a non-threatening posture. Video surveillance shows Sydnor pushing Plaintiff to the floor with the assistance of a security officer and then striking Plaintiff at least three times with his baton. Medical records show that Plaintiff received two strikes to his head that caused gaping open wounds. At a later point in the video, defendant Sydnor can be seen either kicking or stepping on the Plaintiff who laid on the ground seemingly unresponsive.

Despite video surveillance clearly showing that defendant Sydnor struck Plaintiff with a baton no fewer than three times, defendant Sydnor testified under oath that he did not intend to hit the Plaintiff with a baton:

Q.     Okay. So at what point did you decide to hit him with the baton?

A.     I did not hit him with the baton.

Q.     Oh. You-

A.      I never decided to hit him with the baton. I never intentionally hit him with the baton.

Q.      So you didn't hit him with the baton.

A.      Yes, I hit him with a baton.

Q.      So at what point did you decide to hit him with a baton?

A.      I did not intentionally hit that male.

Q.      So can you describe how –

A.      Yes.

Q.      -- you hit him?

A.      Yes. When we were going out that door and I'm grabbed from behind when that person pulled me to the ground, my baton accidentally hits him in the head as I'm falling to the ground.

Q.      Okay.

        So it was an accidental hit to the head?

A.      Yes. It was an accident.

Q.      How many times did you accidentally hit him in the head with the baton?

A.      It was just that one time, ma'am. When I was falling to the ground, like I said, my baton swung that way, and it hit – it grazed him on the head.  (Sydnor Dep. 151-152)

Video surveillance, witness testimony, Sydnor' own police report, and medical records show that Sydnor did *not* accidentally "graze" Plaintiff in the head with a baton. Sydnor's testimony on this matter is nothing short of a bald-faced lie.

<u>**ARGUMENT**</u>

**I.**   **Evidence Related to Sydnor's Triggering the Early Warning System And the Failure of ACPD to Respond to those Triggers In Accordance With The New Jersey Attorney General Guidelines Is Admissible Evidence of Deliberate Indifference on the Part of the City.**

Plaintiff intends to present evidence through defendant Sydnor himself and Plaintiff's experts that defendant Sydnor repeatedly triggered the early warning system ("EWS") between 2006 and 2014 by accumulating three or more internal affairs complaints within a calendar year and by racking up a disproportionate number of civil rights lawsuits alleging excessive force. Sydnor will testify that prior to 2015 he was never notified that he had triggered the EWS by any metric (excessive force complaints, civil law suits, use of force incidences) and neither the Chief of Police nor anyone in his chain of command bothered to respond to his activation of the EWS. No supervisor spoke to him about his triggering of the EWS, suggested or ordered additional monitoring or counseling, ordered that he be reassigned or undergo remedial training, or ordered him to submit to a psychological evaluation. As former Chief Jubilee has testified, prior to 2015 the City was "tracking" complaints but was doing "nothing" with the information.

Furthermore, Plaintiff intends to present evidence through his experts and the former Chief of Police that the City failed to comply with the Risk Management Procedures of the Attorney General Guidelines and their own Internal Affairs policies by tracking Sydnor's conduct and identifying any patterns in that conduct before they became a "glaring" problem. Both of Plaintiff's experts Dr. Shane and Dr. Fisher will testify that had the department complied with its obligations under the Attorney General Guidelines and ACPD's own policies, a clear pattern would emerge showing that Sydnor was rapidly accumulating excessive force complaints

or other complaints involving unwanted touching or violence, including multiple allegations of sexual assault/abuse and domestic violence. Had that pattern been identified and responded to in an appropriate and meaningful way, Plaintiff would not have suffered the injuries he did.

Another pattern that would have emerged had the internal affairs function and the Chief of Police effectuated a meaningful EWS, is a pattern showing that accumulated a significant proportion of complaints while working special employment details at the casinos. Indeed, Sydnor has been a named in defendant in at least six separate lawsuits involving his conduct while doing special employment details. This type of glaring pattern should have resulted in Sydnor losing the opportunity to earn extra income working special employment details. Indeed, working special employment details was a perk of the job that permitted officers to make extra income. Rather than take that privilege away from Sydnor when he began accruing disproportionate complaints while working these special employment details, the City rewarded him by allowing to keep that privilege. Again, this testimony is highly relevant to the question of *Monell* liability and whether the City had a custom or practice that encouraged the use of excessive force, particularly among officers working special employment details.

Critically, during the *Stadler* litigation, Judge Kugler permitted Plaintiff to introduce evidence to the jury concerning the defendant officers triggering of the early warning system, their pattern of excessive force complaints and the City's failure to respond in any meaningful way to the officers' triggering of the system. When offering evidence related to City's risk management procedures, Plaintiff did not attempt to elicit specific testimony about internal affairs allegations. Moreover, Judge Kugler mitigated the potential prejudice of this evidence by instructing the jury on its limited use. Based on the jury's verdict in *Stadler*, it would appear that the jurors heeded Judge Kugler's admonitions and did not punish the individual officers for the

failings of the department as a whole. Arguably, the verdict suggests that the defendant officers benefited from the overwhelming evidence against the City.

II.     **Additional Evidence from Sydnor's Complaint History Is Admissible to Show that the City Failed to Take Steps to Determine Defendant Sydnor's Fitness for Duty Despite Considerable Evidence of Misconduct that Demanded a Full-Scale Review of His Fitness for Duty.**

Plaintiff alleges that the City of Atlantic City had a "sham" internal affairs function that served to cover-up and minimize officer misconduct. Defendant Sydnor is the poster child for the City's failures in this regard. Defendant Sydnor's complaint history reveals an alarming array of serious violent conduct that the City routinely ignored, minimized, and overtly covered-up.

Plaintiff's expert Dr. Wayne Fischer writes in his report,

[I[t is my opinion that the Atlantic City Police Department should have taken steps to determine Officer Sydnor's fitness for duty at some point prior to the incident underlying this litigation. The 21 complaints, with more than half alleging inappropriate violent or forceful conduct, were in and of themselves more than sufficient as provided in the Attorney General's police. The accumulation of excessive force allegations should have, in my opinion, lent more urgency to having Officer Sydnor undergo a fitness for duty evaluation than was apparently the case. A review of Officer Sydnor's performance and conduct should have been undertaken in a context broader than the facts attending each complaint as it came along. (Fischer Report at pg. 38-39 attached to FPTO)

Plaintiff's expert Dr. Jon Shane further opines:

Officer Sydnor's internal affairs history began to accumulate around April 2005 and steadily increased between 2005 and 2016, including several complaints for excessive force, harassment, demeanor, and assault that were not addressed or were only addressed in a facile manner that did not change Officer Sydnor's behavior. (Shane Report (5/5/17) at pg. 20 attached to FPTO)

In addition to presenting testimony from his experts, Plaintiff intends to show that the prior Chiefs of Police under which Sydnor served, including Chief Mooney and Jubilee, were

fully aware of Sydnor's pattern of violent and criminal conduct and repeatedly failed to address it.

### A.      Sydnor's Criminal History

Even prior to his hiring by the department, Sydnor had a serious criminal arrest history that should have raised red flags with the department, including multiple arrests for assault, criminal mischief, aggravated assault, possession of a weapon, and terroristic threats. Prior to being hired by the department, Sydnor had a 1997 finding of guilt for the offense of criminal mischief, and in 1998 Sydnor pled guilty to fourth degree criminal possession of a weapon – a felony offense.

Sydnor's personnel files show that the City was fully aware of Sydnor's arrest history and the fact that he was a convicted felon when he was hired by the department. While that arrest history, in and of itself, may not have disqualified Sydnor as a candidate for employment by ACPD, it should have prompted the City to pay close attention to this officer for any signs of misconduct.

The specific nature of Sydnor's criminal history should have put the department on high alert that this rookie should be monitored extra closely. For example, in August of 1996, Sydnor was charged with aggravated assault and possession of a weapon for an unlawful purpose when he allegedly stabbed S.D. four times in the stomach, chest, and back.  Sydnor ultimately worked out a plea agreement whereby he pled guilty to fourth degree criminal possession of a weapon. Notably, the incident stemmed from what appeared to be a domestic dispute since S.D. was his wife's ex-husband or boyfriend. Notably, S.D. later made an internal affairs complaint against Sydnor for harassment and Sydnor's index card reflects at least two other domestic violence incidences.

And in December 2002, Sydnor was charged with terroristic threats after offering to kill his paramour's husband. Sydnor was having an affair with a woman named Tanya Cruz while her husband was incarcerated. Apparently, the woman's husband intercepted some emails between Tanya Cruz and Sydnor in which Sydnor offered to kill her husband anytime and that perhaps the newspaper would report that his body was found with his head cut off. Those charges were ultimately dismissed.

Plaintiff does not intend to offer specific evidence of Sydnor's arrest history or specific information about the underlying cases. However, Plaintiff does intend to elicit testimony from various internal affairs investigators (Sergeant Macready and Sergeant Russack) that when they were investigating claims of assault against Sydnor they were denied the information about his arrest history and did not consider his arrest history in any way shape or form in determining whether there was merit to those internal affairs complaints, many of which involved allegations consistent with his arrest history. Notably, internal affairs investigators routinely rely on a complainant's arrest/criminal history to conclude that the complainant's version of events is not credible. That investigative tactic is never used when assessing the veracity or credibility of an officer's account.

Similarly, Plaintiff intends to elicit testimony from the Chiefs under whom Sydnor served to testify that they were familiar with Sydnor's criminal background and despite his active accrual of complaints starting in 2005, they did nothing to subject Sydnor to additional monitoring and did not consider his criminal history in making any conclusions about Sydnor's supervision.

## B.      IA Investigation 06-008

Plaintiff intends to present evidence related to the internal affairs investigation surrounding allegations by J.C.[1] who alleged that Sydnor sexually assaulted her while he was on-duty and in full uniform. On February 9, 2006, J.C. called 911 and reported that a black officer in full uniform had forced her to give him oral sex in her apartment. J.C. did not know the identity of the officer. The complainant and a witness to the assault (Hiram Perez) voluntarily came to internal affairs on February 11, 2006 to make a recorded statement about the incident. J.C. and Perez were shown a photo array (six-pack) and both independently identified defendant Sydnor as the perpetrator.

Both J.C. and Perez told internal affairs how they first observed Sydnor near the area of Adams Ct. and that Sydnor followed them to J.C.'s apartment before entering her apartment uninvited. Once inside, Sydnor forced J.C. to perform oral sex on him both in the kitchen area and the bathroom. Perez confirmed that he could clearly see the assault in the kitchen from where he was positioned. Neither J.C. nor Perez had any prior interactions with Sydnor. Furthermore, two other witnesses placed Sydnor in the apartment.

Sydnor admitted that he conducted a "field interview" of J.C. and Perez near Adams Ct. and told them that he wanted to go to their apartment "to check her residence." Sydnor denied entering the apartment and claimed that he only went into the entrance way. Sydnor further admitted that when he encountered J.C. and Perez and followed them to her apartment, he was outside of his district and had not provided his location to dispatch or communicated that he was conducting a "stop" J.C. and Perez in direct contradiction of policy. Sydnor implausibly claimed

---

[1] Victims will be referred to by their initials.

that he went to J.C.'s apartment as some type of "counseling session" to assist her in getting help for a drug addiction.

Notwithstanding the above, the County Prosecutor's office refused to supersede the investigation or criminally charge Sydnor. And despite finding J.C. and Perez's accounts credible, ACPD inexplicably declined to recommend sustaining the charge for sexual assault. The internal affairs investigator noted that:

> J.C.'s 911-phone call to police may not prove her allegations, but her one comment to the dispatcher is a strong indication that it may have occurred. Without being asked specifically what had happened, she blurted it out by saying, "Who? The same guy (officer) who made me suck his dick in the kitchen?" Although I find J.C. and Perez's statement to be credible, there is not enough proof [to] either criminally charge Sydnor (the prosecutor's office declined to investigate the case further) or sustain charges departmentally for these specific acts.

This case offers a prime example of how both the Atlantic County Prosecutor's office and ACPD apply an unreasonably high standard of proof to cases involving claims against police office officers. Here, more than ample evidence existed that should have led to an indictment of Sydnor for sexual assault, yet the prosecutor's office inexplicably deferred the investigation to ACPD. Incredibly, even after the internal affairs investigator concluded that the victim and witness corroborated one another, were credible, and that Sydnor had no plausible or lawful reason to be in J.C.'s home, ACPD refused to sustain a finding of official misconduct and sexual assault. Instead, ACPD slapped Sydnor's wrist giving him a one-day suspension for being outside of his district.

First, evidence concerning ACPD's handling of this assault is relevant to Plaintiff's claims that ACPD's internal affairs function does not operate in accordance with the Attorney General guidelines. As Dr. Shane opines in his report, ACPD routinely treats criminal allegations as mere administrative complaints and that even when the County Prosecutor declines to indict,

it does not mean that ACPD is precluded from investigated an allegation as a criminal offense, albeit a non-indictable one. Second, as Dr. Shane reports, "flawed IA investigations are endorsed by ACPD supervisors." In this particular investigation, every member up the chain of command, including the Chief of Police, concurred with the recommendation not to sustain this allegation. Third, even if there was insufficient evidence to sustain a finding of sexual assault (there was actually more than sufficient evidence to indict), this serious incident should have prompted Sydnor's command staff to subject him to additional monitoring. ACPD's failure to respond in any meaningful way to a woman's credible allegations that she was raped by an on-duty officer in uniform is unconscionable and compelling evidence of "deliberate indifference." Evidence concerning the City's handling of this investigation is directly relevant to Plaintiff's *Monell* claims and specifically explains how the City's failure to supervise Sydnor led to his continued assaults on the citizenry of Atlantic City and even other officers.

### C.      IA Investigation 07-132

The City's failure to respond to J.C.'s credible claim of sexual assault against Sydnor invariably led to Sydnor's assault of a fellow female officer. According to officer R.S., she and Sydnor had dropped two prisoners off at the Atlantic County Justice Facility and were driving back to the Public Safety Building when Sydnor twice grabbed her upper thigh, near her groin area against her wishes. R.S. stated that she pushed his hand away and that he drove her to an unfamiliar area which was alarming to her. Sydnor suggested they go to the Atlantic County range to be alone. R.S. demanded that he drive her back to the City, and Sydnor eventually complied. R.S. reported feeling unsafe with Sydnor. R.S. was so afraid after the incident that she did not immediately report it, fearing that she would be the target of harassment. Indeed, a fellow

female officer with whom she initially confided took it upon herself to report the incident to her superior.

Again, rather than investigate this matter as a criminal offense, the Atlantic County Prosecutor's refused to indict or conduct its own investigation into the allegation. Following that lead, ACPD treated the incident as a minor administrative violation rather than a crime. According to the IA investigative files, R.S. told the prosecutor's office she did not want to pursue it; however, during her deposition in this case, R.S. testified that she did not have a recollection of telling the prosecutor's office she did not want to pursue the matter. Unsurprisingly, the internal affairs investigation led to a not-sustained finding. The IA investigator concluded that R.S.'s version of the events was inadequate to justify a sustained finding against Sydnor – notwithstanding that she was the second woman in a year to accuse Sydnor of sexual assault.

Again, evidence concerning the City's treatment of this investigation as a mere "administrative complaint" rather than a serious criminal offense is relevant to Plaintiff's *Monell* claims and demonstrates that ACPD routinely minimizes serious criminal allegations against its officers with approval by the prosecutor's office and endorsement up the chain of command. And again, even if R.S.'s account of the crime was insufficient to sustain the complaint, this incident again should have put Sydnor's chain of command on notice that he desperately needed additional monitoring and should be subjected to fitness for duty examination. Instead, ACPD did *nothing*.

### C.    IA Investigation 06-088

Internal affairs' handling of internal affairs investigation 06-088 is relevant and compelling evidence of the City's "deliberate indifference" to Sydnor's obvious and glaring propensity for violence.

On July 10, 2006, officer Sydnor, officer Cook, and K9 officer Rando were dispatched to the Borgata Hotel Casino concerning a drunk and disorderly male, P.F. Borgata security indicated that they did not wish to sign complaints against P.F. and requested that ACPD escort him off the property. According to the internal affairs report, video surveillance showed the officers escorting the male to the loading dock where their police cars were parked. Sydnor un-cuffed the male and returned the cuffs to a security officer. Video surveillance showed that the male and Sydnor exchanged words and that the male refused to get into the rear seat of Sydnor's police car. It was undisputed that the male was not under arrest and had no obligation to accept the officers' "escort" off the property. According to the IA investigator's report:

> Office Sydnor then grabbed P.F. by the shirt around the shoulder area and attempts to pull P.F. toward the open rear door. P.F. then pulled away from officer Sydnor and he falls to the ground next to the police car. Officer Cook appears to be attempting to assist Office Sydnor with controlling P.F. P.F. attempts to crawl away, but is picked up by Officer Sydnor by the seat of his pants and the back of his shirt. Officer Sydnor now has P.F. off the ground and is holding him by the seat of his pants and his shirt. P.F.'s body is parallel with the ground his head is facing away from the police car. While Officer Sydnor is holding P.F. off the ground his feet hit the open rear door of the Officer Sydnor's police car, closing it. Officer Cook opens the rear door of the police car, while Officer Sydnor spins P.F. around. Still in Officer Sydnor's grasp P.F. is now headfirst facing the opening to the rear seat of the police car. Officer Sydnor now attempts to throw P.F. headfirst into the rear seat area of his police. While the open rear door partially blocks the view, P.F.'s body can be seen abruptly stopping and falling to the ground. It is unclear what part of his body strikes the police car if any, but it appears some portion of his upper body or his arms come into contact with the police car before he falls to the ground outside the open rear seat area. Officer Sydnor then picks P.F. up a second time and forces him into the rear seat of his police car. Office Sydnor closes the rear door of his police car and the officers appear to be leaving the area.

Office Sydnor purportedly dropped P.F. at the bus station, but P.F. was found unconscious a mere 15 minutes later in the parking lot of an Applebee's Restaurant with a head injury.

Again, the Atlantic County Prosecutor's office declined to supersede this investigation which involved a serious criminal allegation and kicked it back to ACPD to investigate. Internal Affairs investigator Sergeant Russack concluded that P.F.'s head injuries were not caused by any member of ACPD but was unable to determine how those injuries occurred. The complainant himself could not recall how he ended up unconscious in the Applebee's parking lot.

However, Russack did conclude that Officer Sydnor's handling of P.F. while attempting to transport him to the bus station amounted to excessive force. Russack wrote that the "force [Sydnor] used to get him into the rear seat of his police can only be described as excessive." Russack further found, "Officer Sydnor did not use sound judgment or appropriate discretion when handling an intoxicated individual who needed transportation home."

Russack recommended sustained findings for: (1) "standard of conduct" because the manner which officer Sydnor used to physically force P.F. into the rear seat of his police car was "unprofessional" and unnecessary and clearly subjected P.F. to possible physical injury; (2) "performance of duty" for violating the department's Use of Force policy by using excessive force; (3) "conduct toward the public" because Sydnor was neither courteous or orderly when he attempted to throw P.F. into the rear of the police vehicle; and (4) "truthfulness" for being untruthful in describing how P.F. got into the rear seat of the police car. Office Sydnor misled the investigator by falsely stating that "guided P.F. into his vehicle as if sitting an old lady down on the seat."

Notwithstanding these serious allegations and findings, Sydnor received no consequence for his actions. After P.F. filed a lawsuit against the department, a disciplinary hearing officer for the Atlantic City recommended dismissing all charges against Sydnor and the department complied.

Plaintiff seeks to present evidence from IA investigator Russack and the Chief of Police to demonstrate that even *after* an investigator concluded during this investigation that video evidence reflected that an officer used excessive force, the City refused to discipline Sydnor for this conduct. Officers, like defendant Sydnor, get the message that their uses of force will not be taken seriously and as a result they continue to use excessive force. This evidence is relevant to Plaintiff's *Monell* claims that the City failed to supervise its officers and operated a superficial and meaningless internal affairs function.

**III.     Plaintiff Is Entitled to Introduce Evidence Concerning A Number Complaints Against Sydnor Pursuant to Fed. R. Evid. 404(b) to Show Knowledge, Intent and Absence of Mistake.**

Sydnor testified under oath that he did not intentionally strike Plaintiff and that Plaintiff's injuries were accidentally caused by Plaintiff's baton "grazing" his head. Video surveillance of the incident is clear and unambiguous; defendant Sydnor intentionally struck Plaintiff multiple times. Furthermore, medical records confirm that Moore suffered two serious gashes to his head from baton strikes. A review of Sydnor's complaint history reveals a striking pattern of Sydnor claiming ignorance or mistake when individuals are seriously injured in his care and custody, particularly complainants who are intoxicated.

Select evidence culled from Sydnor's internal affairs history is relevant and admissible pursuant to Fed. R. Civ. P. 404(b). Rule 404(b) prohibits the admission of "[e]vidence of a crime,

wrong, or other act … to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Rule 404(b), however, does permit evidence of crimes, wrongs, and other acts to be admitted to prove, among other things, knowledge or absence of mistake. Fed. R. R. Evid. 404(b)(2) "To be admissible under Rule 404(b), evidence of uncharged crimes or wrongs must (1) have a proper evidentiary purpose; (2) be relevant; (3) satisfy Rule 403; and (4) be accompanied by a limiting instruction (where requested) about the purpose for which the jury may consider it." *United States v. Green*, 617 F.3d 233, 249 (3d Cir. 2010).

### A.    IA Investigation 06-088

Plaintiff seeks to show the jury video surveillance of the incident described more fully above during which Sydnor threw P.F. into the back seat of his car in contrast to Sydnor's statements to IA investigator Sergeant Russack about the incident. As Sergeant Russack reported, Sydnor was not truthful about his handling of P.F. based on the video evidence. This evidence is relevant to refute Sydnor's claims of "mistake" or "accident." Sydnor's state of mind is relevant to Plaintiff's assault claim and prior conduct by Sydnor showing that he has pattern of claiming "accident" even in the face of video evidence showing otherwise is highly relevant to defendant's intent.

### B.    IA Investigation 09-070

Similarly, Plaintiff seeks to call the complainant from this incident, S.P. who reported that he was having a verbal disagreement with a bouncer at Harrah's when officer Sydnor assaulted him without justification causing him serious facial injuries. Medical records reflect that the complainant suffered a right eye contusion with serious swelling. In contrast Sydnor testified that he struck the complainant in the upper torso and that any injuries he sustained to his

head or face were caused unintentionally when he was on the ground. S.P.'s testimony is relevant

to show that similar to the instant case, Sydnor attempted to avoid responsibility for his

purposeful conduct in punching the complainant in the face by claiming that the complainant's

injuries were caused accidentally or incidentally. This testimony is further relevant on the

question of Sydnor's intent as Plaintiff has alleged that Sydnor assaulted him .

### C.    IA Investigation 09-097

The complainant alleged that while attempting to assist her elderly mother off of the

ground, officer Sydnor grabbed her by the throat, pushed her to the ground and held her down by

her throat while verbally threatening to "fuck her up." Sydnor assaulted her in the presence of

her young children. Photographs of the complainant's injuries corroborate her claims. In contrast

Sydnor claimed that he grabbed the woman's arm because he believed she was being disorderly

but did not push her to ground or assault her in any way and that she received the injuries from a

prior altercation with a family member. As stated above, testimony from complainants to show

that Sydnor routinely claimed that injuries he intentionally and purposefully inflicted on suspects

were "accidents" is relevant to rebut Sydnor's claims here that Plaintiff's injuries were caused

accidentally.

### D.    IA Investigation 14-099

Plaintiff seeks to present testimony from S.A. who will testify that that a fight broke out

at the Tropicana and that during the commotion, officer Sydnor punched him in the face,

handcuffed him, kicked him in the nose and threw him into a wishing well. S.A. received an

ordinance and sent on his way. According to Sydnor the incident didn't happen, and any injuries

received by S.A. were caused because he was "fighting" and had nothing to do with Sydnor.

Again, testimony from S.A. is relevant for non-propensity purposes to show that Sydnor

routinely injures individuals (often during special employment details) and then claims that the injuries occurred in some other manner than how the complainant describes them and often contrary to the physical evidence.

The evidence described above is offered for a purpose other than to simply show that Sydnor is a "bad" person. This evidence goes directly to Sydnor's intent and shows that despite his claims to the contrary, Plaintiff's injuries were not accidentally inflicted but were intentionally and purposefully caused by Sydnor striking his baton at Plaintiff's head. The probative value of this evidence outweighs any prejudicial effect, and this Court can cure any prejudice to defendant Sydnor by giving a limiting instruction about how the evidence may be used.

IV.     **Testimony Of Janine Costantino Is Relevant And Admissible To Demonstrate That The City Had A *De Facto* Policy, Practice, Or Custom Of Allowing Its Officers To Function As Unsupervised Bouncers That Put The Citizens And Visitors Of Atlantic City At Grave Risk.**

Plaintiff will present testimony that Sydnor accumulated nearly half of his internal affairs complaints while conducting special employment details and that virtually every civil suit filed against him involved an allegation of excessive force while working in a special employment detail. Despite this obvious pattern of risk, the City ignored the warning signs and continued to allow Sydnor, and other officers similarly situated (*e.g.,* officers Timek, Wheaten) to conduct special employment details where they continued to rack up excessive force complaints and civil lawsuits for excessive force.

However, to establish *Monell* liability, Plaintiff must also show that the City's policy

19

concerning special employment details was widespread and amounted to a standard operating procedure. Accordingly, Plaintiff intends to have his expert Dr. Shane testify on this point and to further present testimony from Janine Costantino who was assaulted by Sterling Wheaten, another ACPD officer while he was serving as a bouncer at Dusk Nightclub. This evidence is offered to show that Sydnor was not an outlier but rather his behavior while conducting special employments details was consistent with those of other officers and condoned by the City.

Plaintiff does not intend to call David Connor Castellani as a witness in this matter.

**V.       Dr. Fischer's Expert Report Does Not Offer Improper "Net Opinions."**

Defendant Sydnor objects to Dr. Fischer's expert report but fails to identify what precisely is objectionable other than Dr. Fischer's expert opinion that defendant Sydnor's baton strikes to Plaintiff's head were intentional. Defendant Sydnor claims that Dr. Fischer is simply passing of Plaintiff's version of events as "net opinions."

Dr. Fischer does not offer a net opinion but rather opines that consistent with the video evidence, the medical records of Plaintiff's injuries, Plaintiff's account, and even Defendant Sydnor's police report, Sydnor's baton strikes were intentional and not accidental. There is nothing inappropriate or improper about this testimony. If any expert is passing off a party's version of events it is defendant Sydnor's "expert" Bryon Marshall who in reaching his "opinion" ignored clear video evidence refuting Sydnor's version of events.

## **CONCLUSION**

For the foregoing reasons, Defendant Sydnor's motion *in limine* should be denied

Respectfully Submitted,

/s/JENNIFER BONJEAN